*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SHAWN SYRON, Personal Representative of the
ESTATE OF MARY T. SYRON and the ESTATE
OF MAUREEN THERESE SYRON-WOOD,

      Plaintiff-Appellant,

v

FORD MOTOR COMPANY,

      Defendant-Appellee,

and

SUBURBAN FORD OF OAKLAND COUNTY,

      Defendant.

UNPUBLISHED
November 07, 2025
2:45 PM

No. 371722
Oakland Circuit Court
LC No. 2022-195510-NP

Before: REDFORD, P.J., and FEENEY and BAZZI, JJ.

PER CURIAM.

In this product liability action, plaintiff, Shawn Syron, as the personal representative of the estate of Mary T. Syron and the estate of Maureen Therese Syron-Wood, appeals as of right the trial court's order granting summary disposition to defendant, Ford Motor Company, under MCR 2.116(C)(10) (no genuine issue of material fact).[1] We acknowledge the tragic loss of life in this case. However, for the reasons set forth in this opinion, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

On August 21, 2019, at approximately 10:57 a.m., Edward Lloyd Syron (Edward) drove his 2019 Ford Escape to a condominium in Waterford Township, Michigan, to complete an errand,

---

[1] All references to defendant herein solely pertain to Ford Motor Company because Suburban Ford of Oakland County is not a party to this appeal.

with his wife, Mary T. Syron, and daughter, Maureen Therese Syron-Wood (collectively, decedents), as passengers in the vehicle. Edward, believing he properly parked the subject vehicle, "left the engine running for air conditioning," and he got out of the car to attend to his errand. In the interim, the vehicle "rolled into and became submerged in a pond," resulting in the decedents drowning.[2]

There was initial speculation that the incident was attributable to a gear-shifting defect in the subject vehicle, as identified in Ford Safety Recall 22S43. Ford Safety Recall 22S43, applicable to "2013-2019 Ford Escapes," provided:

> A damaged or missing bushing could prevent the shifter from moving the transmission to the intended gear position. The transmission may not be in the park position, even though the shifter position indicates that the vehicle was shifted to park. The driver does not receive a warning message or audible chime. Exiting a vehicle without the transmission in the park position and without application of the parking brake may allow the vehicle to roll, increasing the risk of injury or crash.

However, the police investigation, corroborated by forensic photographs and data retrieved from the subject vehicle's infotainment system, determined because the "last completely recorded shift was at 10:46:08 and it showed the vehicle was placed into Drive," and "the driver door shows it was last opened at 10:47:06 and closed at 10:47:21 and there was no vehicle door activity after that," the subject vehicle "was left in drive after the driver Edward Syron exited," thereby causing the vehicle to "roll[] forward over a small curb, through the grass and into a pond."

In August 2022, plaintiff filed a complaint in the Oakland Circuit Court contending that defendant breached certain duties by knowingly producing and selling the subject vehicle despite the gear-shifting defect detailed in Ford Safety Recall 22S43, which ultimately resulted in the death of the decedents when the "parked" vehicle rolled away. In September 2022, plaintiff filed his first amended complaint reiterating the previous allegations and asserting that defendant acted unlawfully in manufacturing and distributing vehicles that were "unfit, unmerchantable and unsafe and defective," as the model "contained a defect or defects that allowed or caused it to appear in the 'Park' position when it in fact was in a 'Drive' or other gear position."[3]

Because of certain disclosures during discovery, plaintiff filed a second amended complaint in October 2023, contending that in conjunction with the 2019 Ford Escape's gear-shifting defect, defendant improperly produced and retailed vehicles without a "return-to-park"

---

[2] Edward passed away after the incident from unrelated causes.

[3] At the time plaintiff filed his initial complaint and first amended complaint, plaintiff believed that the incident was caused by the gear-shifting defect delineated in Ford Safety Recall 22S43, and his claims were advanced on that basis. However, as discussed below, plaintiff altered the theory underlying his claims after discovery revealed that the gear-shifting defect did not cause the subject incident.

system,[4] an automatic emergency brake, or a "distinctive and effective audible and visual warning—different than the door chime—alerting the driver that the vehicle was in a gear other than 'Park,' " despite the fact "such alternative design[s] [were] readily available, feasible and in use at the time the Subject Vehicle was built." While not expressly alleged, plaintiff essentially advanced design-defect, failure-to-warn, and manufacturing-defect claims against defendant, and plaintiff asserted that the noneconomic-damages cap iterated under MCL 600.2946a was inapplicable to the underlying action.

In March 2024, plaintiff moved for summary disposition, in part, under MCR 2.116(C)(10), contending MCL 600.2946a's noneconomic-damages cap did not extend to his claims. In April 2024, defendant moved for summary disposition under MCR 2.116(C)(8) (failure to state a claim on which relief can be granted) and (C)(10) arguing, "All of Plaintiff's claims are barred as a matter of law pursuant to MCL 600.2947(2) because the subject vehicle was misused on the date of the incident," as Edward failed to turn off the ignition, shift the transmission to "Park," or apply the parking brake after getting out of the vehicle. Defendant further argued that it was entitled to a presumption of no defect under MCL 600.2946(4) because the subject vehicle complied with the pertinent motor vehicle safety standards. Defendant additionally contended that (1) plaintiff did not present an alternative warning mechanism that would have prevented the alleged harm, (2) defendant "had no duty to warn of the risk of exiting a vehicle with it still in Drive and the engine running because the risk of doing so is obvious," and (3) there was no indication that "an alleged failure to warn was a proximate cause of this incident."

Plaintiff responded that the alleged misuse was reasonably foreseeable to defendant considering the frequency of "incidents of drivers inadvertently exiting their vehicles without shifting into Park," and, "the longstanding and ubiquitous practice of drivers leaving their engines running in extreme temperatures." Plaintiff further argued that the noneconomic-damages cap of MCL 600.2946a was inapplicable because defendant was grossly negligent in failing to implement any effective safety mechanisms in the subject vehicle despite its knowledge of "unintended rollaway events" and "that drivers sometimes exited their vehicles without shifting into Park." Plaintiff additionally asserted that while the vehicle featured visual and auditory signals alerting drivers who opened the car door without shifting the vehicle into "Park," these signals were inadequate, and defendant "had at its disposal safer alternative designs." Plaintiff recognized that the gear-shifting defect did not cause the underlying incident, but he advanced that the accompanying recall was relevant in establishing defendant's notice of rollaway incidents and driver error.

In June 2024, the trial court held a hearing regarding the parties' pending summary disposition motions. Following the parties' arguments, the trial court denied plaintiff's motion for partial summary disposition opining that it was not presented with "caselaw that actual knowledge of a defect is present when a car does not have all the safety features it could possibly have, as opposed to a situation where a function of the car that is supposed to operate in a particular was

---

[4] The "return-to-park" system automatically shifts the vehicle into park when conditions indicate the driver is getting out, such as turning off the engine or unlatching the seatbelt while the vehicle is stationary.

does not operate in that way." The court subsequently addressed defendant's motion for summary disposition, first resolving that product misuse did not bar plaintiff's claims, explaining that there was a genuine factual dispute regarding whether defendant "was aware that drivers sometimes misuse their vehicles by exiting the vehicles while they are still in drive. The proof of this is [defendant's] own warning devices that warn driver[s] [] when they did this, and in [National Highway Traffic Safety Administration (NHTSA)] 2011 warnings about this behavior."

The trial court, however, ruled that summary disposition was proper as to plaintiff's individual claims. Regarding the applicability of the noneconomic-damages cap, the court recognized the two pertinent exceptions of gross negligence and actual knowledge, and it noted "actual knowledge in this context concerns actual knowledge of a purported defect, which is different from actual knowledge of a particular misuse." The trial court reiterated, "Plaintiff has failed to provide this Court with any case law that the failure to use additional security measures beyond what is standard constitutes a defect in the design of the car." Concerning plaintiff's design-defect claim, the trial court noted that defendant's proofs indicated that (1) the subject vehicle's design complied with relevant safety standards, (2) "less than 10 percent of vehicles manufactured from 2017 to 2019 had these advanced safety features that Plaintiff claims the subject vehicle should have," and (3) defendant "did have a warning system in place through a chime sound and a dashboard warning that warned a driver that the car was not in park."

Concerning plaintiff's failure-to-warn claim, the trial court reasoned because "a reasonably prudent product user would not have left the car in drive when getting out of the car," the "failure to warn does not give rise to liability; therefore, MCL 600.2948(2) bars this claim and the Court grants summary disposition in favor of [defendant] as to the failure to warn claim." The trial court additionally noted plaintiff's concessions regarding his gear-shifting defect and manufacturing-defect claims, ruling summary disposition was appropriate regarding these causes of action. The court concluded that the denial of plaintiff's motion for partial summary disposition, and the grant of defendant's motion for summary disposition in its entirety, was warranted under MCR 2.116(C)(10).

On June 28, 2024, the trial court entered orders consistent with its statements on the record, dismissing plaintiff's claims with prejudice. This appeal ensued.

## II. STANDARDS OF REVIEW

"We review de novo a trial court's determination regarding a motion for summary disposition." *Jostock v Mayfield Twp*, 513 Mich 360, 368; 15 NW3d 552 (2024) (quotation marks and citation omitted). "Under review de novo, a reviewing court gives no deference to the trial court and reviews the case with fresh eyes." *Buchanan v City Council of Flint*, 231 Mich App 536, 542 n 3; 586 NW2d 573 (1998). As previously explained by this Court:

> A motion for summary disposition made under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In ruling on a motion brought under (C)(10), "[t]he Court considers all affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties in the light most favorable to the party opposing the motion." In addition, MCR 2.116(G)(4) requires that a motion under (C)(10) specifically identify and support the issues as to which the moving party believes

-4-

there is no genuine issue regarding any material fact. When this is done, "an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, judgment, if appropriate, shall be entered against him or her." [*Charter Twp of Pittsfield v Washtenaw Co Treasurer*, 338 Mich App 440, 449; 980 NW2d 119 (2021) (citations omitted; alteration in original).]

"A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Innovative Adult Foster Care*, *Inc v Ragin*, 285 Mich App 466, 475; 776 NW2d 398 (2009) (quotation marks and citation omitted). In determining whether a genuine issue of material fact exists, the court must consider the documentary evidence in the light most favorable to the nonmoving party. *Id*.

We further review de novo "a trial court's interpretation and application of a statute." *1373 Moulin*, *LLC v Wolf*, 341 Mich App 652, 664; 992 NW2d 314 (2022) (quotation marks and citation omitted). "The primary goal of statutory interpretation is to give effect to the intent of the Legislature. If the language of a statute is clear and unambiguous, the statute must be enforced as written and no further judicial construction is permitted." *Id*. (quotation marks and citation omitted).

Pursuant to MCR 2.116(I)(2), the trial court may grant summary disposition in favor of the party opposing summary disposition "[i]f it appears to the court that the opposing party, rather than the moving party, is entitled to judgment." When a party moves for summary disposition under MCR 2.116(C)(10), and the trial court grants summary disposition in favor of the opposing party under MCR 2.116(I)(2), this Court administers the standard of review for a motion under MCR 2.116(C)(10). *Cadillac Rubber & Plastics*, *Inc v Tubular Metal Sys*, *LLC*, 331 Mich App 416, 421-422; 952 NW2d 576 (2020). Further, "[i]f, after careful review of the evidence, it appears to the trial court that there is no genuine issue of material fact and the opposing party is entitled to judgment as a matter of law, then summary disposition is properly granted under MCR 2.116(I)(2)." *Id*. at 422.

## III. ANALYSIS

Plaintiff challenges the trial court's summary disposition rulings in his product liability action on several grounds. Product liability actions[5] are governed by Chapter 29 of the Revised Judicature Act,[6] specifically MCL 600.2945 to MCL 600.2949. MCL 600.2946(2) provides:

---

[5] " 'Product liability action' means an action based on a legal or equitable theory of liability brought for the death of a person or for injury to a person or damage to property caused by or resulting from the production of a product." MCL 600.2945(h).

[6] In 1995, the Michigan Legislature enacted tort reform legislation that displaced the application of common-law principles in certain product liability actions in Michigan. See 1995 PA 161 and

In a product liability action brought against a manufacturer or seller for harm allegedly caused by a production defect, the manufacturer or seller is not liable unless the plaintiff establishes that the product was not reasonably safe at the time the specific unit of the product left the control of the manufacturer or seller and that, according to generally accepted production practices at the time the specific unit of the product left the control of the manufacturer or seller, a practical and technically feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product to users and without creating equal or greater risk of harm to others. An alternative production practice is practical and feasible only if the technical, medical, or scientific knowledge relating to production of the product, at the time the specific unit of the product left the control of the manufacturer or seller, was developed, available, and capable of use in the production of the product and was economically feasible for use by the manufacturer. Technical, medical, or scientific knowledge is not economically feasible for use by the manufacturer if use of that knowledge in production of the product would significantly compromise the product's usefulness or desirability.

A "production" defect may be related to the "manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, inspection, testing, listing, certifying, warning, instructing, marketing, selling, advertising, packaging, or labeling" of a product. MCL 600.2945(i). A plaintiff may proceed under several different theories in a product liability action, *Gregory v Cincinnati Inc*, 450 Mich 1, 11; 538 NW2d 325 (1995), but the plaintiff must demonstrate that the defendant supplied a product that was defective and that the defect caused the plaintiff's injury, *MASB-SEG Prop/Cas Pool v Metalux*, 231 Mich App 393, 399; 586 NW2d 549 (1998). While a plaintiff may allege negligence as part of a product liability action, negligence constitutes a theory of liability, not a separate claim. *Heaton v Benton Constr Co*, 286 Mich App 528, 534; 780 NW2d 618 (2009).

## A. PRODUCT MISUSE

Plaintiff argues that the trial court erred by simultaneously denying summary disposition on the basis of product misuse while granting summary disposition on his product liability claims. We disagree.

A distinct statute addresses potential product misuse. "As part of major tort reform efforts in 1995, the Legislature amended the Revised Judicature Act to provide that a 'manufacturer or seller is not liable in a product liability action for harm caused by misuse of a product unless the misuse was reasonably foreseeable.' " *Iliades v Dieffenbacher North America Inc*, 501 Mich 326, 337; 915 NW2d 338 (2018), quoting MCL 600.2947(2) (citations omitted). MCL 600.2947(2) further provides, "Whether there was misuse of a product and whether misuse was reasonably foreseeable are legal issues to be resolved by the court." Accordingly, MCL 600.2947(2)

---

1995 PA 249. The tort reform legislation included 1995 PA 249, by which our Legislature amended the Revised Judicature Act, MCL 600.101 *et seq.*, to include product liability actions.

delineates a two-part test for manufacturer liability regarding reasonably foreseeable product misuse: "in order for a manufacturer to be liable for the misuse of its product, a court must first decide whether there was misuse of the product, and, if so, the court must then decide whether the particular misuse was reasonably foreseeable by the manufacturer." *Iliades*, 501 Mich at 337.

In the present case, the trial court determined that there was a genuine factual dispute regarding whether Edward's misuse of the subject vehicle, i.e., exiting the car without shifting it into "Park," was reasonably foreseeable to defendant, citing defendant's implementation of a warning system for vehicles not placed in "Park," and a 2011 study conducted by the NHTSA. But the court subsequently resolved that plaintiff's design-defect and failure-to-warn claims were inadequate explaining that it had "been provided with no law that this imposed on [defendant] a duty to guard against the foreseeable misuse, and it certainly does not mean that failure to do so constitutes a substantial lack of concern for whether injury results." The trial court further noted, "Plaintiff has failed to provide this Court with any case law that the failure to use additional security measures beyond what is standard constitutes a defect in the design of the car."

While plaintiff contends that the aforementioned rulings "contradict[ed] the trial court's earlier denial of Defendant's motion on the issue of misuse," plaintiff misconstrues the role of product misuse, which generally operates as an affirmative defense to product liability claims rather than as a separate cause of action. See *In re Nat'l Prescription Opiate Litigation*, 458 F Supp 3d 665, 684 (ND Ohio, 2020) (stating MCL 600.2947(2) provides "an 'absolute defense' in *any* type of product liability case if a plaintiff's harm was caused by the *misuse* of a product," but, a plaintiff may "overcome this 'misuse of a product' defense, however, by showing the misuse was 'reasonably foreseeable' to the defendant"); see also *Belleville v Rockford Mfg Group, Inc*, 172 F Supp 2d 913, 918 (ED Mich, 2001) (in examining the pertinent product misuse statutes resolving, "(1) misuse of a product is an absolute defense for a manufacturer or seller of a product in a product liability action; (2) if the misuse was reasonably foreseeable to the Defendant, the defense is obviated; and (3) the Court must make this determination").[7] Further, the disputed finding regarding product misuse does not, by itself, establish that a defect existed or that the essential elements of plaintiff's design-defect and failure-to-warn claims were established, as discussed below.

Moreover, manufacturers have a duty to design their products "to eliminate 'any *unreasonable risk* of foreseeable injury," *Ghrist v Chrysler Corp*, 451 Mich 242, 248; 547 NW2d 272 (1996) (emphasis added), as "manufacturers and sellers are not insurers, and they are not absolutely liable for any and all injuries sustained from the use of their products." *Mallard v Hoffinger Indus, Inc (On Remand)*, 222 Mich App 137, 143; 564 NW2d 74 (1997). The Michigan Supreme Court has additionally emphasized that "theories of products liability have been viewed as tort doctrines which should not be confused with the imposition of absolute liability," *Prentis v Yale Mfg Co*, 421 Mich 670, 681–682; 365 NW2d 176 (1984), as evidenced by the existence of exceptions even for the reasonably foreseeable misuse of a product. See MCL 600.2946(4); MCL

---

[7] "Caselaw from sister states and federal courts is not binding precedent but may be relied on for its persuasive value." *Haydaw v Farm Bureau Ins Co*, 332 Mich App 719, 727 n 5; 957 NW2d 858 (2020).

600.2947(3) and (5); MCL 600.2948. Thus, the trial court did not err in determining that product misuse was an improper basis for summary disposition, while concluding that summary disposition of plaintiff's product liability claims was warranted under MCR 2.116(C)(10).

## B. DESIGN DEFECT

Plaintiff further argues that the trial court improperly granted summary disposition on his design-defect claim. We disagree.

"In Michigan, there are two theories that will support a finding of negligent design." *Gregory*, 450 Mich at 11. "The first theory is based on a failure to warn." *Id*. "The other, more traditional means of proving negligent design questions whether the design chosen renders the product defective, i.e., whether a risk-utility analysis favored an available safer alternative." *Id*. This analysis "considers alternative safer designs and the accompanying risk pared against the risk and utility of the design chosen 'to determine whether . . . the manufacturer exercised reasonable care in making the design choices it made.' " *Id*. at 13 (citation omitted); *Bouverette v Westinghouse Electric Corp*, 245 Mich App 391, 395; 628 NW2d 86 (2001). Courts, however, "have never gone so far as to make sellers insurers of their products and thus absolutely liable for any and all injuries sustained from the use of those products." *Prentis*, 421 Mich at 682-683.

To establish a prima facie case of negligent design, a plaintiff must prove "the product was not reasonably safe at the time the specific unit of the product left the control of the manufacturer or seller . . . ." MCL 600.2946(2). A plaintiff must further demonstrate that under "generally accepted production practices at the time" the allegedly defective product left the control of the defendant, "a practical and technically feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product to users and without creating equal or greater risk of harm to others." MCL 600.2946(2). However, MCL 600.2946(4) provides, in pertinent part:

> In a product liability action brought against a manufacturer or seller for harm allegedly caused by a product, there is a rebuttable presumption that the manufacturer or seller is not liable if, at the time the specific unit of the product was sold or delivered to the initial purchaser or user, the aspect of the product that allegedly caused the harm was in compliance with standards relevant to the event causing the death or injury set forth in a federal or state statute or was approved by, or was in compliance with regulations or standards relevant to the event causing the death or injury promulgated by, a federal or state agency responsible for reviewing the safety of the product . . . .

In this case, defendant properly invoked the rebuttable presumption under MCL 600.2946(4), having demonstrated that the subject vehicle complied with all applicable federal motor vehicle safety standards (FMVSS), including FMVSS 102, which pertained to the "transmission shift position sequence, starter interlock, and transmission braking effect" of a vehicle. 49 CFR 571.102 (2025). Matthew Fyie, defendant's technical leader of design analysis engineering, attested that the subject vehicle adhered to the relevant FMVSS. George Hansen, a core shifter engineer employed by defendant, further affirmed that the subject vehicle was equipped with both an audible chime and a visible warning displayed on the instrument cluster,

which activated when the driver opened the door or disengaged the seatbelt without shifting the vehicle into "Park." Defendant additionally presented a report detailing NHTSA data regarding "rollaway" events between 2008 and 2020, indicating such incidents amounted to less than 1% of all nontraffic accident occupant fatalities.

Plaintiff contends that, assuming the presumption of nonliability applies, he has presented sufficient evidence to rebut it. Plaintiff essentially argues that alternative safety features were available that may have prevented the incident, and that defendant was aware the subject vehicle was exhibiting "unintended movement," regardless of the underlying cause. But we conclude that plaintiff presented no evidence that the transmission and braking systems, aspects of the product that allegedly caused the harm, failed to comply with federal regulations. Neil Hanneman, an automotive engineer testifying on plaintiff's behalf, conceded that he was unable to demonstrate that the subject vehicle was noncompliant with any pertinent FMVSS in effect when it was manufactured, including those regulating the transmission shift mechanism and parking brake systems. Hanneman further acknowledged that the FMVSS did not mandate the automatic engagement of an electronic parking brake or the incorporation of a return-to-park feature in vehicles—mechanisms identified by plaintiff as feasible alternative designs. Additionally, Fyie asserted that "based on the survey conducted of peer-vehicles from 2017-2019, over 90% were equipped with mechanical shifters, and of those, 10% or fewer had electronic parking brakes that may activate automatically when the vehicle is in Drive (and only under certain conditions)." This also supports the conclusion that defendant's design choice, evaluated in the context of the prevailing industry and regulatory standards at the time of manufacture, was adequate.

While plaintiff repeatedly cites his proofs regarding "unintended rollaway" incidents involving Ford Escape vehicles, those incidents featured vehicles that moved despite being placed in "Park," unlike the instant case, in which the driver failed to engage "Park," leading to the vehicle's inadvertent movement. See *Halbrook v Honda Motor Co, Ltd*, 224 Mich App 437, 445; 569 NW2d 836 (1997) ("While automobile manufacturers can limit defects in their products, as a matter of public policy, we are not willing to hold them liable for the consumers' misuse of their products.") Moreover, while plaintiff presented evidence that there was a risk of drivers neglecting to shift into "Park," he did not provide information regarding the number or frequency of such driver-error incidents, nor did he properly quantify the magnitude of the risk. See *Haberkorn v Chrysler Corp*, 210 Mich App 354, 364; 533 NW2d 373 (1995) ("A plaintiff has the burden of producing evidence of the magnitude of the risk posed by the design, alternatives to the design, or other factors concerning the unreasonableness of a design's risk.") Plaintiff further contends that the trial court improperly granted summary disposition on both the failure-to-warn and design-defect claims because neither defendant nor the court substantively addressed plaintiff's underlying allegations. But defendant and the trial court extensively examined the merits of plaintiff's product liability action, addressing both his prior theory concerning a gear-shifting defect and his contention that the vehicle lacked certain necessary safety features.

Plaintiff additionally asserts that the trial court failed to adequately consider his "alternative design evidence." Again, the record plainly provides otherwise. During the motion hearing, the trial court noted that it "rejects [defendant's] argument that Plaintiff has not put forward some evidence concerning an alternate safety warning because Plaintiff has put forth some evidence that louder chimes, such as those used for backup cameras and collision detection might have been more appropriate in this context." But the court reasoned, "Plaintiff has failed to provide this Court

with any caselaw that the failure to use additional security measures beyond what is standard constitutes a defect in the design of the car." Thus, the court acknowledged plaintiff's presentation of alternative designs but determined that plaintiff did not cite sufficient caselaw or controlling authority demonstrating that manufacturers such as defendant are obligated to design vehicles for maximum safety, or that any deviation from such a standard constitutes a design defect. See *Lesho v Textron*, *Inc*, 408 F Supp 2d 329, 335 (ED Mich, 2005) ("However, simply because the product does not incorporate features that would make it safer, does not mean that the product is necessarily unsafe.") See also *Wood v Detroit*, 323 Mich App 416, 424; 917 NW2d 709 (2018) ("[S]imply alleging that an actor could have done more is insufficient under Michigan law, because, with the benefit of hindsight, a claim can always be made that extra precautions could have influenced the result.") (Quotation marks and citation omitted). The plain language of MCL 600.2946(2) reinforces this principle, as the statute limits liability to products that were "not *reasonably safe* at the time the specific unit of the product left the control of the manufacturer or seller," (emphasis added), rather than requiring the product to embody the highest possible degree of safety.

Indeed, this Court has recognized that "neither negligence nor products liability jurisprudence establishes the legal principle that every injury warrants a legal remedy." *Mallard*, 222 Mich App at 143. While, ideally, manufacturers would design products with maximal safety in mind, Michigan courts have consistently held that product liability does not impose absolute responsibility on manufacturers for all injuries arising from their products. See *Prentis*, 421 Mich at 683 ("Like the courts in every other state, whether a suit is based upon negligence or implied warranty, we require the plaintiff to prove that the product itself is actionable—that something is wrong with it that makes it dangerous.") See also *Bazinau v Mackinac Island Carriage Tours*, 233 Mich App 743, 758-759; 593 NW2d 219 (1999) (mandating manufacturers "design safety devices for every conceivable misuse . . . is not the law of Michigan"); *Halbrook*, 224 Mich App at 444 ("Automobile manufacturers are not insurers. We find they are not bound to guard against the careless misuse of their products by negligent drivers . . . .") Because plaintiff failed to overcome the rebuttable presumption under MCL 600.2946(4), or otherwise establish that defendant's failure to implement additional safety features to mitigate driver error amounted to a design defect, the trial court properly granted summary disposition as to plaintiff's design-defect claim.

## C. FAILURE TO WARN

Plaintiff additionally argues that the trial court erred by granting summary disposition on his failure-to-warn claim. We disagree.

MCL 600.2948, in Chapter 29 of the Revised Judicature Act, "governs a defendant's duty to warn of an obvious danger in a products-liability action." *Greene v AP Products*, *Ltd*, 475 Mich 502, 508; 717 NW2d 855 (2006). MCL 600.2948(2) states:

> A defendant is not liable for failure to warn of a material risk that is or should be obvious to a reasonably prudent product user or a material risk that is or should be a matter of common knowledge to persons in the same or similar position as the person upon whose injury or death the claim is based in a product liability action.

-10-

A " 'material risk' is an important or significant exposure to the chance of injury or loss." *Greene*, 475 Mich at 510. In construing the statutory language, the Michigan Supreme Court has opined that "the Legislature has imposed no duty to warn beyond obvious material risks. The statute does not impose a duty to warn of a specific type of injury that could result from a risk." *Id*.

In this case, lamentably, decedents drowned after the subject vehicle, mistakenly left in "Drive," became submerged in a pond. However, pursuant to the statute and applicable precedent, defendant did not maintain a duty to warn because it is common knowledge that a vehicle in "Drive" will move absent intervention, and the unintended movement may result in harm to the vehicle's occupants. See *Greene*, 475 Mich at 511 ("Under the law, however, defendants owed no duty to warn of specific injuries or losses, no matter how severe, if it is or should have been obvious to a reasonably prudent product user that ingesting or inhaling Wonder 8 Hair Oil involved a material risk.") Further, as recognized by the trial court, "Any reasonably prudent individual with a driver's license understands that the entire point of the park function is that it ensures that the car stays still when it is parked, and that to leave a car in drive means that the vehicle will continue to move." Additionally, the subject vehicle's owner manual provided instructions regarding the proper means to stop the vehicle when it is stationary, which Edward did not adhere to, and warned, "Always fully apply the parking brake and make sure you shift into park (P). Failure to follow this instruction could result in personal injury or death."

Although plaintiff frequently references evidence of "unintended rollaway" incidents involving Ford Escape vehicles, those events concerned vehicles that moved notwithstanding being placed in "Park," whereas in the present case, the driver neglected to shift the vehicle into "Park," causing inadvertent movement. Further, plaintiff's reliance on *Owens v Allis-Chalmers Corp*, 414 Mich 413; 326 NW2d 372 (1982), to advance the "obvious-danger exception" is unpersuasive, because the common-law principles governing *Owens* were displaced by MCL 600.2948(2)'s "obviousness" scheme. *Greene*, 475 Mich at 507-508. In light of the foregoing, we conclude that defendant owed no duty to further warn plaintiff that the failure to shift the vehicle into "Park" before getting out of the vehicle posed a material risk. Accordingly, there were no genuine issues of material fact regarding plaintiff's failure-to-warn theory, and the trial court did not err in granting summary disposition as to plaintiff's claim.[8]

Affirmed.

/s/ James Robert Redford
/s/ Kathleen A. Feeney
/s/ Mariam S. Bazzi

---

[8] We decline to address whether the noneconomic-damages cap of MCL 600.2946a is applicable because plaintiff has not established summary disposition was improper as to his individual claims; thus, the issue of appropriate damages is not presently relevant. We further note that while plaintiff frames gross negligence as an individual claim, negligence constitutes a theory of liability, not a separate claim, *Heaton*, 286 Mich App at 534. Rather, the matter of gross negligence pertained to the implementation of MCL 600.2946a, as gross negligence is recognized as an exception to the statutory noneconomic-damages cap per MCL 600.2946a(3).